UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR DEVICE WITH CALL NUMBER ENDING -9808 | Case No. 3:23-MJ-279 (TOF) |
| | **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT AND ORDERS PURSUANT TO 18 U.S.C. §§ 3122 AND 3123

I, Genaro Medina Jr., a Special Agent of the Federal Bureau of Investigation, New Haven Division, having been duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned the following call number: (929) 624-9808 ("**Target Telephone**") that is in the custody or control of T-Mobile (the "Service Provider"). T-Mobile is a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. As a provider of wireless communications services, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Service Provider to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B. Because I am seeking the prospective collection of information, including cell-site location

1

information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C. §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Telephone**.

3.      According to T-Mobile, the **Target Telephone** has the customer and subscriber name listed as "Jeimy Rodriguez" and the service and billing address listed as "53 Haynes Road, West Hartford, CT. 06117, USA."  The **Target Telephone** is believed to be utilized by JAIME PEREZ RODRIGUEZ, a.k.a. "Pompa."

4.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United Sates Code. I have been employed as a Special Agent with the FBI since July 2002. As a Special Agent for the FBI, I have received basic drug training at the FBI Academy located in Quantico, Virginia.  I have attended FBI-sponsored training focusing on the use of informants and cooperating witnesses.  I have also attended additional gang and narcotics trainings sponsored by federal, state, and local law enforcement agencies.  I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations.  I have executed warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities. As a federal law enforcement officer, I have participated in numerous investigations involving the illegal distribution of controlled substances.   I have coordinated controlled purchases of illegal drugs utilizing

confidential sources and cooperating witnesses.  I have coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, illegal firearms, and acts of violence to include homicide.  I have conducted electronic and physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and testified before federal grand juries regarding such matters. I have also interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and local, state and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.  I have previously served as the co-case agent and administrative agent on two Title III investigations and have participated in numerous other Title III investigations.

5.     I am currently assigned to the FBI's Northern Connecticut Gang Task Force ("NCGTF"), an FBI sponsored Task Force consisting of officers from the Connecticut State Police (CSP), East Hartford Police Department (EHPD), New Britain Police Department (NBPD), Hartford Police Department (HPD), West Hartford Police (WHPD) and Connecticut Department of Correction (DOC.)  I am one of the case agents that have directed the investigation that is the subject of this Affidavit, in conjunction with members of the NCGTF.  I have participated fully in this investigation and, because of this participation, as well as information provided by other law enforcement officers, I am thoroughly familiar with the information contained herein.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

3

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 (possession with intent to distribute and distribution of controlled substances), 846 (attempt and conspiracy to possess with intent to distribute controlled substances), and 843(b) (use of a telephone to facilitate a drug trafficking felony) (the "Target Offenses"), were committed, are being committed, and will be committed by RODRIGUEZ and his associates.  There is also probable cause to believe that the location of the **Target Telephone** will constitute evidence of the Target Offenses, including the location of RODRIGUEZ, the identification and locations of his supplier(s) of illegal narcotics, and the locations of stash locations for narcotics and narcotic proceeds.

8.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

9.      The Northern Connecticut Gang Task Force (NCGTF) is presently investigating members of the *Loose Cannons*, an Outlaw Motorcycle Club (OMC) that is engaged in narcotics trafficking, among other offenses.  In particular, the NCGTF is investigating Jaime RODRIGUEZ, a.k.a. "Pompa," Joshua ROMAN, a.k.a. "Josh," and other members of the *Loose Cannons* who are distributing illegal narcotics to include prescription pills, fentanyl, and cocaine. Members of the *Loose Cannons* are also known to unlawfully possess firearms.

4

10.    Agents and Task Force Officers learned that RODRIGUEZ and his associates are also loosely affiliated with the *Hells Angel* OMC. In fact, through a review of call detail records and surveillance operations, the FBI has learned that RODRIGUEZ is a close associate of JASON LABOY, the current president of the *Hells Angels* in Connecticut. This association is also evident in RODRIGUEZ's and LABOY's social media accounts.

11.    In and around December 2020, investigators learned that Phillip GARCIA, a.k.a. "Flip," the then president of the *Elusive Riders* OMC, was selling large quantities of illegal narcotics and prescription pills. The *Elusive Riders* is under the umbrella of the *Loose Cannons*. After a brief investigation, which included a Title III wiretap on GARCIA's wireless phone, investigators learned that GARCIA was supplied cocaine by RODRIGUEZ and others. GARCIA was later arrested and charged by indictment with distributing fentanyl and cocaine and conspiring to distribute fentanyl and cocaine.   In a post-arrest interview, GARCIA admitted that RODRIGUEZ was one of his cocaine sources of supply.

12.    During the Summer of 2021, the Harford (CT) Police Department responded to a shots-fired incident at the *Loose Cannons* club house on Ledyard Street in Hartford, CT.  Officers and first responders arrived and located one victim shot in the abdomen and suffering from serious injuries.   Intelligence gathered from witnesses was that RODRIGUEZ ordered an unknown "Prospect" of the *Loose Cannons* to shoot the victim.  Multiple illegal armor piercing bullet casings were recovered from the scene.   The victim, who survived, refused to cooperate in the investigation.   Investigators obtained a social media video post documenting the incident; however, the person who took the video was never located. An FBI confidential human source (the "CHS") revealed that RODRIGUEZ, as president of the *Loose Cannons*, ordered the shooting of the victim because RODRIGUEZ felt disrespected. The investigation into the shooting ongoing.

13.     Between December 2022 and January 2023, investigators successfully recruited the CHS, who is a direct associate of RODRIGUEZ and corroborated the information described above. CHS's criminal history includes prior felony convictions for drug possession, robbery, and burglary. CHS has pending felony charges for drug trafficking and firearm possession and is working with law enforcement in the hopes of receiving favorable consideration at sentencing. Investigators have generally been able to corroborate information provided by CHS, through consensually recorded calls, surveillance, and other investigative techniques. To my knowledge, CHS has not knowingly provided any false information to investigators. In the context of this investigation, I believe CHS to be reliable.

14.     The CHS confirmed that RODRIGUEZ is the current president of the *Loose Cannons* and is an associate of LABOY. The CHS also confirmed that RODRIGUEZ supplied kilogram quantities of cocaine and had access to fentanyl and illegal firearms.  The CHS was also aware that RODRIGUEZ was obtaining kilograms of narcotics in the mail and that they were delivered to several residential locations in the greater Hartford Connecticut area.  The CHS also reported that RODRIGUEZ supplies illegal narcotics to other members of the *Loose Cannons*. The CHS also provided investigators with RODRIGUEZ's cellular telephone number identified as **Target Telephone.**

15.     In February 2023, CHS was tasked with participating in a recorded consensual conversation with RODRIGUEZ to inquire about illegal narcotics.  Prior to the meeting, the CHS called and texted RODRIGUEZ on **Target Telephone**.  RODRIGUEZ agreed to meet the CHS in Hartford, CT.  At the meeting, RODRIGUEZ discussed future business ventures to include a restaurant and a motorcycle garage.  At one point in the conversation, the CHS asked RODRIGUEZ about narcotics. RODRIGUEZ stated that he was "grabbing it today." In CHS's

presence, RODRIGUEZ then used the **Target Telephone** and called, via FaceTime, FNU LNU, a.k.a. "Sosa" at an unknown number, and they discussed an alternate source of supply for cocaine.

16.     In March 2023, CHS was tasked with participating in a recorded conversation with RODRIGUEZ and facilitating a controlled narcotics purchase of fentanyl. Prior to their meeting, at the direction of investigators but outside their presence, CHS called and utilized Facebook Messenger to contact RODRIGUEZ on **Target Telephone** to set up a meeting. According to CHS, during the last conversation, CHS counted the FBI evidence funds on video to show RODRIGUEZ that he/she was ready to purchase the narcotics. CHS informed RODRIGUEZ that he/she had $4,000 to spend and preferred the narcotics to be fentanyl. They agreed to meet at RODRIGUEZ's garage on 1795 Broad Street, Hartford, CT. RODRIGUEZ also told the CHS that an associate of RODRIGUEZ's would be at the garage as well.

17.     Prior to the meeting, task force members met with CHS at a confidential location and checked CHS for any illegal contraband with negative results. CHS was then provided with an audio/video recording device and $4000 in FBI evidence funds. CHS was then followed from that location to the area Broad Street and New Britain Avenue in Hartford, CT.

18.     Task force members established surveillance around 1795 Broad Street in Hartford, CT around 1:15 p.m. The surveillance team made the following pertinent observations, at the approximate times listed, leading up to the controlled drug transaction:

- 2:10 p.m.  CHS received an incoming message from RODRIGUEZ who stated he was going to his mother's residence first. (*NOTE: RODRIGUEZ's mother is Glenis PEREZ, DOB xx-xx-1961, for whom public records list an address of* 248 Albany Avenue, Hartford, CT.)

- 2:25 p.m.  TFO Caron arrived at 248 Albany Avenue, Dominican Beauty Bar, which is a salon believed to be owned by PEREZ. TFO Caron did not observe any vehicles associated with RODRIGUEZ there.

- 2:38 p.m.   SA Carney arrived at 53 Haynes Street, West Hartford, CT, which investigators know to be RODRIGUEZ's residence.

- 3:32 p.m.   SA Carney observed RODRIGUEZ's white BMW sedan arrive at 53 Haynes Street. SA Carney observed RODRIGUEZ, an unknown female and two children all exit the vehicle and proceed inside the residence. (*NOTE: Per CT DMV records, this 2015 white BMW 3 Series sedan is registered to RODRIGUEZ's mother PEREZ, as are four other vehicles. PEREZ also has a valid CT pistol permit.*)

- 3:38 p.m.   CHS advised that he/she received a call from RODRIGUEZ who stated that he had to pick up his children from school and would then be heading to the garage.

- 3:44 p.m.   SA Carney observed RODRIGUEZ, the unknown female and two children exit the residence, enter the white BMW, and then depart the area.

- 4:00 p.m.   TFO Moody observed the white BMW arrive at the 1795 Broad Street garage and park in the rear parking lot.

- 4:02 p.m.   CHS was followed by SA Medina and SA Jones as he/she traveled from the confidential location to the 1795 Broad Street garage.

- 4:06 p.m.   TFO Moody observed a blue Toyota Tacoma arrive at the garage. The truck had a four-wheel quad in the back bed. Two unknown Latino males exited the vehicle. (*NOTE: the Tacoma's plate, CT BB40577, was later observed. It is registered on a gray 2021 Toyota Rav4 to a VIVIAN CRESPO, DOB xx-xx-1976, from Meriden, CT.*)

- 4:07 p.m.   CHS arrived at the garage. TFO Moody observed RODRIGUEZ exit his vehicle, greet the CHS, then walk toward the CHS's vehicle and place an unknown object in the driver's side door. Then RODRIGUEZ, an unknown male, and the CHS all walked toward the front of the garage and used keys to get into the garage.

- 4:10 p.m.   SA Medina advised that the CHS had entered the garage.

- 4:18 p.m.   TFO Moody observed the CHS walk toward his/her vehicle and enter the vehicle.

- 4:19 p.m.   TFO Moody observed RODRIGUEZ carry a box from the garage and place it in the trunk of his BMW sedan. RODRIGUEZ then entered the BMW driver's side door.

- 4:20 p.m.   TFO Moody advised that the CHS was exiting the garage and departing from the area.

- 4:22 p.m.   TFO Moody advised that the BMW had exited the garage and was proceeding north on Broad Street.

- 4:45 p.m.   Surveillance terminated.

8

19.     After the meeting describe above, CHS drove directly to the confidential location to meet with investigators. CHS's person and vehicle were checked for any excess contraband with negative results. At this time, SA Medina retrieved the electronic recording device and was provided with a plastic knotted bag of suspected fentanyl. A subsequent field test was completed by TFO Cruz and showed a positive result for fentanyl. The bag later weighed in at 80.4 grams.

20.     Also at the debriefing, CHS provided the following information: Upon arriving at the garage, CHS met with RODRIGUEZ and three other Latino males, one of whom RODRIGUEZ identified as "Chuppi." RODRIGUEZ told the CHS that Chuppi was his partner in the garage business and his fentanyl source of supply. After RODRIGUEZ walked over to CHS's vehicle and then returned, RODRIGUEZ told the CHS that he had placed the narcotics in the CHS's vehicle. CHS asked RODRIGUEZ if the product was 80 grams, which RODRIGUEZ acknowledged. The CHS then provided RODRIGUEZ with the $4000 in FBI evidence funds as they walked into the garage.

21.     Based on my training and experience, and information developed during this investigation, there is probable cause to believe, and I do believe, that RODRIGUEZ is currently utilizing the **Target Telephone** in furtherance of drug trafficking activity and that the information requested in this warrant will help investigators locate the **Target Telephone**, which is likely to lead to the discovery of evidence of drug trafficking activity, including the location of RODRIGUEZ, the location(s) where RODRIGUEZ may be storing fentanyl and proceeds he derives from illegal narcotics distribution, and the identification of other co-conspirators in his drug trafficking activity.  In my training and conversations with other law enforcement officers who are familiar with drug trafficking activity, drug traffickers usually carry their cell phone(s) on their person to narcotics transactions to facilitate meetings, to communicate with the associates

they intend to meet with on an ongoing basis, and to keep track of the whereabouts of their associates *en route* to a meet location and while they are at their stash locations.  Having the cell phone(s) on their person allows the meet location to be changed very quickly or set at the last moment, which is often a counter-surveillance ploy.  In addition, having the cell phone(s) on their person allows them to conduct business more efficiently and while on the move even when they visit stash locations or sources of supply.  In addition, having a cell phone on their person also allows a drug trafficker to arrange other transactions while going to one transaction to ensure a consistent flow of business.

### Cell-Site Data

22.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Telephone**.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.   I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

23.     Based on my training and experience, I know that T-Mobile also collects data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular telephone accessing its network, providers such as T-Mobile use PCMD and other data to calculate and record the estimated location of that

cellular telephone.   T-Mobile refers to the resulting location information as  Timing Advanced Information, and/or Timing Advance Report Date ("True Call").

### E-911 Phase II / GPS Location Data

24.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

25.     Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on the Service Provider's network or with such other reference points as may be reasonably available.

### Pen-Trap Data

26.     Based on my training and experience, I know that every cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile

11

Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI).  The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## AUTHORIZATION REQUEST

27.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41 as, based on the facts set forth above, I believe that the location of the **Target Telephone** will lead to evidence of the Target Offenses.  I also request that the Court authorize the use of a pen register and trap and trace device as the information sought is material and relevant to an on-going investigation into the Target Offenses.

28.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

29.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Telephone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The FBI shall

reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

30.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

31.     Because the warrant will be served on the Service Provider, who will then compile

the requested records at a time convenient to it, reasonable cause exists to permit the execution of

the requested warrant at any time in the day or night.  I further request that the Court authorize

execution of the warrant at any time of day or night, owing to the potential need to locate the

**Target Telephone** outside of daytime hours.

Respectfully submitted,

GENARO MEDINA JR.
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone
on March 27, 2023, in Hartford, Connecticut.

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned (929) 624-9808 ("**Target Telephone**"), which is a cellular telephone, with an unknown subscriber, that is in the custody or control of T- Mobile  (the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2. **Target Telephone**

1

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider:**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the account listed in Attachment A:

1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Telephone** for a period of 30 days prior to the date of the warrant, including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

2. Information associated with each communication to and from the **Target Telephone** for a period of 30 days from the date of the warrant, including:

    a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    b. Source and destination telephone numbers;

    c. Date, time, and duration of communication; and

    d. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Telephone** will connect at the beginning and end of each communication.

3. Information about the location of the **Target Telephone** for a period of 30 days, during all times of day and night. "Information about the location of the **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as "per call measurement data" or "PCMD" and Timing Advanced Information, Timing Advance Report Date, or "True Call."

    a. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information,

2

facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **Target Telephone** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.   The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   b. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

4. This warrant does not authorize the seizure of any tangible property or the contents of any communications.

**II. Information to be Seized by the Government:**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21, United States Code, Sections 841 (possession with intent to distribute and distribution of controlled substances), 846 (attempt and conspiracy to possess with intent to distribute controlled substances), and 843(b) (use of a telephone to facilitate a drug trafficking felony) involving JAIME PEREZ RODRIGUEZ and others yet to be identified during the thirty day period from the date of the warrant.

3